UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:

REZULIN PRODUCTS LIABILITY LITIGATION                    MASTER FILE
(MDL No. 1348)                                           00 Civ. 2843 (LAK)

This Document Relates to: 00 Civ. 8064, 01 Civ. 2466
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## AMENDED MEMORANDUM OPINION

Appearances:

Peter D. St. Phillip, Jr.
Stephen Lowey
Richard W. Cohen
Todd Garber
LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
*Attorneys for Plaintiffs Louisiana Health Service & Indemnity Company and Edgar Romney, as trustee of Eastern States Health and Welfare Fund*

David Klingsberg
Steven Glickstein
Robert Grass
Laurie Sternberg
Bert L. Slonim
KAYE SCHOLER LLP

Quentin F. Urquhart, Jr.
IRWIN FRITCHIE URQUHART & MOORE LLC

*Attorneys for Defendant Warner-Lambert Company*

LEWIS A. KAPLAN, *District Judge*.

Sponsors of group health benefit plans ("Health Benefit Providers" or "HBPs") typically contract with pharmacy benefit managers ("PBMs"), which then administer their prescription drug programs. At least some PBMs operate mail-order pharmacy services as well as

networks of participating retail pharmacies. Each time a patient sends a prescription to a PBM's mail-order service, or presents a prescription in a retail pharmacy that belongs to the PBM's network, the pharmacy or mail order department enters the patient's information into an electronic system operated by the PBM. The system verifies the patient's prescription drug coverage and determines the amounts owed by the HBP and the patient. In addition, the PBM typically develops a list of drugs covered under an HBP's plans, known as a formulary. One consequence of this system is that pharmaceutical manufacturers direct a great deal of their promotional efforts at PBMs rather than at the PBMs' clients, the HBPs.

The plaintiffs in the present suits are HBPs.[1] They claim that defendant Warner-Lambert Company ("WL")[2] misrepresented the safety and efficacy of Rezulin, an oral drug for treating type 2 diabetes that was introduced in March 1997 and withdrawn in March 2000 after the FDA determined that its risk of causing liver injury was unacceptable given the existence of safer alternatives.[3] The premise of the suit is that the plaintiffs would have excluded Rezulin from their formularies and thus paid less for type 2 diabetes drugs from March 1997 to March 2000 (the "Relevant Period") if WL had not made those alleged misrepresentations. The plaintiffs sue for what they describe as "the benefit of the bargain – the difference between the amounts they paid for

---

[1] Plaintiff Edgar Romney, who sues here as the representative of Eastern States Health and Welfare Fund ("ES"), of course is not an HBP himself. Nevertheless, for convenience of expression, this opinion sometimes refers to ES as a plaintiff.

[2] At the time of filing, WL was a Delaware corporation with its principal place of business in New Jersey. *See* Am. Cpt. ¶ 1; Answer ¶ 1. It now is part of or owned by Pfizer, Inc.

[3] *See* St. Phillip Decl. Ex. 51 (Edwin A.M. Gale, *Lessons from the Glitazones*: *A Story of Drug Development*, 357 LANCET 1870 (2001)), Ex. 5.

Rezulin and the lesser amounts they would have paid for better alternative drugs."[4]

The matter is before the Court on the defendant's motion for summary judgment. It presents, among other issues, the questions whether the HBPs can recover for breach of warranty and under consumer protection statutes when they never had any form of ownership of the drugs and all of the alleged misconduct at issue was directed not at them or their beneficiaries, but at the PBMs with which they had contracted.

*Facts*

The defendant's motion is based largely on undisputed facts.[5]

A. *The Health Benefit Providers: Eastern States and Louisiana Blue Cross*

Eastern States Health and Welfare Fund (together with its predecessor,[6] "ES") provides medical benefits for past and present members of UNITE!, formerly known as the Union of Needletrades, Industrial and Textile Employees.[7] Plaintiff Edgar Romney is chairman of ES's

---

[4]     Pl. Mem. 2.

[5]     Needless to say, merely because one party denies a properly-supported assertion in the other's Local Rule 56.1 Statement does not create an issue of fact if the cited evidence reveals no genuine factual dispute.

[6]     The predecessor was the ILGWU Health Services Plan, which terminated on December 31, 1997. Sternberg Decl. Ex. D.

[7]     Efron Decl. ¶¶ 1, 3; Hirsch Decl. ¶ 5.

committee of trustees.[8] He is a citizen of New York,[9] the state in which ES is located.[10] ES's funds are contributed by employers under collective bargaining agreements.[11] ES has no employees. During the Relevant Period, it was administered by employees and officers of UNITE!, which ES paid for those services.[12]

Plaintiff Louisiana Health Service & Indemnity Company ("LBC"), which does business as Bluecross and Blueshield of Louisiana, is a health insurer with its principal place of business in Louisiana.[13] LBC offers health plans through which Louisiana-based employers provide health benefits to employees and offers health coverage to others.[14]

## B. The Pharmacy Benefit Manager: Medco

Medco Health Solutions, Inc. (together with predecessors, subsidiaries and affiliates, "Medco" or "PAID") during the Relevant Period was a large national PBM with its principal place

---

[8]    Sternberg Decl. Ex. C ("Hirsch Dep.") at 18-21.

[9]    Def. 56.1 St. ¶ 1; Pl. Response to Def. 56.1 St. ¶ 1.

[10]   Sternberg Decl. Ex. E ("ES Contract") at 1, Ex. F ("ILGWU Contract") at 1.

[11]   Sternberg Decl. Ex. B ("Efron Dep.") at 90-91; Hirsch Dep. 19, 22-23, 53-54; Hirsch Decl. ¶ 6.

      Retired beneficiaries also may have made contributions to ES during the relevant time, but the record is not conclusive on this point. *See* Hirsch Dep. 13, 16-17.

[12]   *See* Hirsch Dep. 11-12; Efron Dep. 9, 19; Efron Decl. ¶ 1.

[13]   Sternberg Decl. Ex. L ("LBC Contract") at 1.

[14]   Sternberg Decl. Ex. J ("Ford Dep.") at 29, 32-33.

of business in New Jersey.[15] ES and LBC each contracted with Medco to manage the prescription drug component of its plans.

Medco operated a mail service and maintained a network of participating retail pharmacies. Its electronic system determined claims submitted by the retail pharmacies at the time the patients presented prescriptions, and determined the amounts owed by the patient as "copayments" and by the HBP. In the case of ES, most medications, including Rezulin, were covered only through the mail service. In the case of LBC, medications could be obtained both through mail service and retail pharmacies. Medco, among other services that it provided to the HBPs and their beneficiaries, furnished utilization reports to the HBPs, supplied plan members with identification cards,[16] and operated a toll-free customer service telephone line.[17]

ES's[18] and LBC's master contracts with Medco each specified formulas for

---

[15]

St. Phillip Decl. Ex. 2 at BCL3836, Ex. 17.

[16]

Beginning in 1998, LBC apparently began supplying its members with its own identification cards. LBC Contract 20.

[17]

*See* ES Contract; ILGWU Contract; LBC Contract; Efron Dep. 24-27, 34-36; Ford Dep. 48-49, 75-77, 130-31, 178-79; Efron Decl. ¶ 8; Heltz Decl. ¶ 5.

[18]

The Court here describes only the mail service, not the retail component, of ES's contracts. The retail terms differed but are largely irrelevant because ES did not cover the dispensation of Rezulin through retail pharmacies.

It is worth noting as well that the record includes two of ES's contracts. The first as amended was intended to be effective until June 30, 1998. ILGWU Contract 17-18. The second, which presumably superceded the first, was effective as of January 1, 1998 despite having been signed in September and October of 1999. ES Contract at 1, 13. It apparently was the norm for ES to negotiate its contracts "after the fact." Efron Dep. 22-23. The record does not indicate whether the parties behaved in accordance with the first or second contract from January 1, 1998 to the fall of 1999.

calculating the total amounts owed to Medco for each prescription filled. Under the contracts with ES, Medco typically was owed for each prescription a flat rate set forth in the contract, which was $42.80 at the start of the Relevant Period and $48.67 by the end.[19] The exceptions were Rezulin during part of the Relevant Period and a small number of other drugs specially designated by the FDA as an advance over existing therapies, for which Medco was owed the drug's average wholesale price, as set forth in nationally recognized pricing sources ("AWP"), discounted by 17 percent.[20] Under LBC's contract, the amount owed for prescriptions dispensed by mail service was AWP discounted by a standard percentage, which was 22 percent for brand name drugs and 45 percent for generic drugs, plus a dispensing fee of $2.50. For retail service, LBC owed the lowest of (1) "the pharmacy's usual and customary price, as submitted," (2) "the PAID maximum allowable cost" plus a dispensing fee of $2.00 for brand name drugs and $2.50 for generic drugs, and (3) AWP discounted by 13 percent, plus the dispensing fee.[21]

The copayments owed by the patients generally were specified in the individual plans offered to employers and not set forth in the master contracts between the HBP and Medco.[22] Except

---

[19]

The contracts actually provided that Medco was owed the lower of (1) the flat rate multiplied by the number of prescriptions, and (2) the sum of each prescription's average wholesale price discounted by 21 percent for brand name drugs and 45 percent for generic drugs. In practice, however, (2) always exceeded (1). The amount owed Medco therefore was based on the flat rate, not the wholesale prices of the individual drugs. Efron Dep. 45-47.

[20]

ES Contract 14-15; ILGWU Contract 17-18; Efron Dep. 45-46, 75-84.

[21]

LBC Contract ¶ 3.5, 12; Ford Dep. 177-79.

[22]

The exception is the earlier ES contract, *see* footnote 18 above, which specifies a copayment of $10. ILGWU Contract ¶ 4.4; Efron Dep. 43.

in the case of LBC's retail program, the copayments were deducted from the total amount owed

Medco as described above to arrive at the portion of that amount owed by the HBP.[23] In the case of

LBC's retail program, the copayment did not reduce the amount derived from the formula described

above.[24]

Two pertinent invoicing arrangements were in effect during the Relevant Period.

Under the first, which applied to ES during 1997 and perhaps for some time thereafter,[25] ES prepaid

Medco $360,000 each week. Each month, one party would pay the other, as applicable, the

difference between the amount ES prepaid the month before and the amount ES owed for

prescription drugs dispensed to its members during that month.[26] Under the second invoicing

arrangement, which applied to ES for the remainder of and to LBC throughout the Relevant Period,

every two weeks Medco provided the HBPs with a consolidated invoice for all medications

dispensed to plan members through Medco's retail and mail service programs.[27]

LBC's contract specified as well a per-prescription "Base Administrative Fee" of

$0.28, $0.29, or $0.35, depending on the time period and the LBC plan in question. Medco invoiced

---

[23]

*See* ES Contract 14-15; LBC Contract 12; Ford Dep. 69; Efron Decl. ¶ 9; *see also* Heltz
Decl. ¶ 6.

[24]

*See* LBC Contract 12.

[25]

*See* footnote 18 above.

[26]

ILGWU Contract ¶ 4.5, 18; Efron Dep. 43-47.

[27]

ES Contract ¶ 7.1, 14-15; LBC Contract ¶ 6.1, 12; Efron Dep. 28; Ford Dep. 139, 170.

LBC for these fees on a monthly basis.[28]

ES and LBC never possessed, stored or insured medications against loss. The HBPs were not involved in Medco's and the retail pharmacies' purchases of Rezulin and other medications.[29] Indeed, neither Medco's dealings with participating retail pharmacies and wholesalers, nor the retail pharmacies' relationships with wholesalers, nor the wholesalers' relationships with pharmaceutical manufacturers such as WL, are illuminated in any significant way by the present record.[30]

The contracts provided that Medco and the HBPs were independent contractors. In particular, ES's contract stated:

> "The relationship among PAID, [PAID's affiliated mail-order pharmacy company] and the PLAN shall solely be that of independent contractors engaged in the operation of their own respective businesses. No party is or shall be deemed or construed to be an employee, agent, representative or joint venturer of any other party for any purpose whatsoever."[31]

LBC's contract stated:

> "The relationship among PAID, [PAID's affiliated mail-order pharmacy company] and [LBC] shall solely be that of independent contractors engaged in the operation of their own respective businesses."[32]

---

[28]

LBC Contract ¶ 6.2, 13-15, 19-20.

[29]

Efron Dep. 28, 52-55, 69-70; Ford Dep. 50-52, 77.

[30]

The report of the Federal Trade Commission and the U.S. Department of Justice submitted by plaintiffs only gives an overview of the PBM industry, not specifics applicable to Medco or this case. *See* St. Phillip Decl. Ex. 6.

[31]

ES Contract 11.

[32]

LBC Contract 9.

By way of summary and illustration, the following chart summarizes the flow of drugs and funds among the relevant players:



*C. The Formularies*

A formulary is a list of FDA-approved drugs covered by an HBP's plan. Medco maintained proprietary formularies, which it modified from time to time "as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations."[33] Decisions about whether to include drugs in its formularies were made by a Pharmacy & Therapeutics Committee composed of allegedly independent medical and pharmacological experts (the "P&T Committee"). The P&T Committee reviewed each drug for safety, efficacy, and cost.[34] Medco reserved the right to modify or replace its formularies during the contract term. In ES's case, that right as relevant here was subject to "the consent of [ES] which consent shall not be unreasonably withheld."[35]

Before entering into a contract with Medco, the HBPs reviewed the formularies and could customize them, either by adding or deleting drugs.[36] After the contracts were entered into, the HBPs could modify prescription drug coverage – including, in the case of LBC, tailoring the

---

[33]

ES Contract ¶ 6; LBC Contract ¶ 5, 20-21; *see also* Efron Dep. 32, 38, 47-48, 96; Ford Dep. 49, 85, 126-29.

[34]

Sternberg Decl. Ex. H at 3, Ex. M at 2; Efron Dep. 47-48; Ford Dep. 85; Bradbury Decl. ¶ 2; St. Phillip Decl. Ex. 3 ("Cavic Dep.") at 36.

[35]

ES Contract ¶ 6.2.1; LBC Contract ¶ 5, 20-21.

[36]

*See* Hirsch Dep. 36-37; Ford Dep. 117-18, 187; Caldiero Decl. ¶ 4; Efron Decl. ¶ 7; Hirsch Decl. ¶ 4; Heltz Decl. ¶ 4; ES Contract ¶ 1.4 (defining "Covered Drugs" as "all drugs which, under state or federal law, require a prescription. Covered Drugs and/or Exclusions shall be designated by the PLAN in" schedules appended to the contract); LBC Contract ¶ 1.4 (similar).

coverage provided by individual plans[37] – but only with Medco's written consent.[38] Neither ES nor LBC made significant modifications to the formularies during the Relevant Period. ES, which retained a pharmaceutical consultant from time to time, occasionally questioned the exclusion of a drug.[39] LBC during the relevant time period never asked Medco to modify the formulary.[40]

       Medco typically received rebates from manufacturers in exchange for including their products in its formularies. The contracts with the HBPs allocated the resulting savings between Medco and the HBPs in ways that varied by program and formulary.[41]

---

[37]
    *See* Ford Dep. 115, 117.

[38]
    *See* ES Contract ¶ 1.13 (defining "Plan Design" as "Progam drug coverage . . . and other Program specifications applicable to the Program set forth in this Agreement or otherwise agreed to, in writing, between the parties"), ¶ 2.4 ("The Plan Designs, and any modifications thereto, are subject to the prior approval of PAID and [PAID's affiliated mail service pharmacy company]."), ¶ 14.7 ("The Program Pricing Terms set forth in this Agreement are based upon the Plan Designs, Minimum Enrollment and Program specifications agreed to between the parties as reflected in this Agreement and as otherwise hereafter agreed to by the parties in writing."); LBC Contract ¶ 1.12 (defining "Plan Design" as "the Covered Drugs/Exclusions, Copayment/Coinsurance and other Program specifications applicable to each Group as set forth in this Agreement and otherwise agreed to, in writing, by the parties"), ¶ 2.4 ("The Plan Design for each Group is subject to the prior approval of PAID which approval shall not be unreasonably withheld."), ¶ 13.7 (providing that certain pricing and payment provisions appended to the contract "are based upon the Plan Designs and Program specifications agreed to between the parties as reflected in this Agreement and as otherwise agreed to by the parties in writing. Any material modification of the Plan Designs or Program specifications is subject to PAID's prior approval, which approval shall not be unreasonably withheld . . . ."); Efron Dep. 103-04.

[39]
    Efron Dep. 38-39, 48-52.

[40]
    Ford Dep. 129.

[41]
    *See* ES Contract ¶ 6; LBC Contract 20-21; Ford Dep. 149-51, 156-57, 179-81; Efron Dep. 85-87.

D.    *Inclusion of Rezulin in ES's and LBC's Formularies*

In 1997, Medco's P&T Committee decided to include Rezulin in at least two of Medco's standard formularies, both of which in substance were used by LBC.[42] ES's formulary also included Rezulin.[43] Medco's P&T Committee made its decisions after receiving a clinical summary of Rezulin prepared by Medco staff.[44] The summary relied to a significant extent on product information furnished by WL,[45] which promoted Rezulin in connection with its launch and directed significant marketing efforts at PBMs, including Medco.[46] Rezulin was significantly more expensive than the standard diabetes drugs on the market at the time.[47]

WL did not direct any marketing efforts at ES or LBC because it knew that they were clients of Medco and that Medco, not the HBPs themselves, administered their pharmacy benefits.[48] Medco sometimes provided news and information about products to its client HBPs, and in 1999 informed ES and other HBPs about recent changes in Rezulin's labeling, including recommended

---

[42]    Bradbury Decl. ¶¶ 3-5; Hoomian Decl. ¶¶ 3-4; *see also* Sternberg Decl. Ex. M at 23, Ex. N at 11.

[43]    Sternberg Decl. Ex. H at 6; Efron Dep. 59-60; Efron Decl. ¶ 7.

[44]    Bradbury Decl. ¶¶ 2-3.

[45]    *See* Bradbury Decl. Ex. 1 (citing product information furnished by Parke-Davis).

[46]    *See* St. Phillip Decl. Ex. 8, Ex. 21 at 51, Cavic Dep. 12, 51-53, 200.

[47]    *See* Cavic Dep. 93; St. Phillip Decl. Ex. 4 ("Witcher Dep.") at 64, Ex. 15.

[48]    *See* Cavic Dep. at 197-99.

usage and guidelines for monitoring patients taking the drug.[49]

There is no evidence that ES or LBC had any contact with WL and its representatives during the relevant time. ES did not attend promotional events in connection with the Rezulin launch, request information about Rezulin from WL, or review WL's marketing materials. LBC produced no documents concerning, and its designated deponent could not recall, any communications with WL or its representatives regarding diabetes medication or any other matter.[50] While LBC does have a medical staff, the staff has no special expertise in diabetes treatment and made no attempt during the relevant period to gain anything other than routine familiarity with Rezulin.[51]

E.      The Present Action

Romney filed suit in this court. LBC filed suit in the United States District Court for the Eastern District of Louisiana. Both cases were assigned to the undersigned as part of the Rezulin multidistrict litigation ("MDL"). The Court granted WL's motion to dismiss on the ground that the allegations of proximate causation were insufficient.[52] The Second Circuit vacated,[53] following which the plaintiffs filed an amended complaint. Familiarity with the Second Circuit decision is

---

[49]

*See* Efron Dep. 68, 96; St. Phillip Decl. Exs. 11, 12.

[50]

Efron Dep. 91-94; Hirsch Dep. 61-63; Ford Dep. 53-55; Sternberg Decl. Ex. O at 2.

[51]

*See* Sternberg Decl. Ex. K ("Brower Dep.") at 22-29.

[52]

*In re Rezulin Prods. Liab. Litig.*, 171 F. Supp. 2d 299 (S.D.N.Y. 2001).

[53]

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003).

assumed.

The amended class action complaint asserts claims for unjust enrichment, equitable restitution of payments for unused Rezulin, breach of warranty, and violation of the consumer protection or deceptive trade practices statutes of 26 states. All claims are based on allegations that WL misrepresented the safety and efficacy of Rezulin. The Court accepts these allegations as true for purposes of this motion because the defendant, while not admitting those allegations, does not assert their falsity as a basis for this motion.

*II. Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[54] The moving party has the burden of demonstrating the absence of a genuine issue of material fact,[55] and the Court must view the facts in the light most favorable to the nonmoving party.[56] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[57] In that event, the nonmoving

---

[54]
    Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

[55]
    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[56]
    *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

[57]
    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 273 (2d Cir. 2001).

party must come forward with admissible evidence[58] sufficient to raise a genuine issue of fact for trial.[59]

### III.  Choice of Law

The plaintiffs argue that New Jersey law governs their claims because WL and Medco were based there. Alternatively, they contend that the Court should apply the laws of 30 other jurisdictions in which members of ES's and LBC's plans received Rezulin.[60] The defendant argues that New York law applies to ES's claims and Louisiana law to LBC's claims.

A federal court sitting in diversity normally applies the choice of law rules of the state in which it is located.[61] When an action is transferred as part of an MDL, the transferee court applies

---

[58]

*See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

[59]

*E.g.*, *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

[60]

The plaintiffs contend that the defendant waived its objection to the application of New Jersey law by failing to dispute it earlier and that the Second Circuit's decision, which applied New Jersey law, is a mandate to apply New Jersey law here. This argument is meritless. The original complaint purportedly was based only on New Jersey law, and both parties referred to New Jersey law in arguing the motion to dismiss the original complaint and the appeal of that dismissal. It was the plaintiffs in their amended complaint who asserted causes of action under the statutes of 30 jurisdictions in addition to New Jersey, including New York and Louisiana. Moreover, WL noted in its brief to the Second Circuit, that it did not concede that New Jersey law applies. St. Phillip Decl. Ex. 10 at 45 n.16. The plaintiffs cite Second Circuit precedent to the effect that a footnote does not adequately raise or preserve an argument for appellate review, *see* Pl. Mem. 11 n.44 (citing *United States v. Barnes*, 158 F.3d 662, 673 (2d Cir. 1998) (citing *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993))), but appellate review is not the issue here. The Second Circuit did not make a ruling one way or the other on choice of law. Indeed, it did not even have before it a factual record that would have permitted definitive holdings on that issue.

[61]

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

the choice of law rules of the state in which the action first was filed.[62] Accordingly, this Court

applies New York's choice of law rules to issues raised by ES's claims and Louisiana's choice of

law rules to issues raised by LBC's claims, subject to the principle – applicable both in New York[63]

and Louisiana[64] – that no choice of law ruling is called for where there is no conflict of laws.

## IV. Was Medco the HBP's Agent?

A number of the plaintiffs' arguments depend on their contention, disputed by the

defendant, that Medco was the HBPs' agent for purposes of purchasing Rezulin.

"Agency is the fiduciary relation which results from the manifestation of consent by

one person to another that the other shall act on his behalf and *subject to his control*, and consent by

---

[62]

*Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)); *accord In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 69 (S.D.N.Y. 2002) (the "Class Certification Opinion").

The Court noted in the Class Certification Opinion that a consolidated amended complaint might be treated for purposes of selecting choice of law rules either (1) as first filed in this court, in which case New York's choice of law rules would govern all of the claims asserted in it, or (2) as a series of separate actions initially filed in the respective districts, in which case the choice of law rules of the relevant states, here Louisiana and New York, would be applied respectively to the claims of the plaintiffs from those states. 210 F.R.D. at 70. Having left this question open earlier, the Court now concludes that the better view is (2). "Consolidation under Rule 42(a) . . . is a procedural device designed to promote judicial economy, and consolidation cannot effect a merger of the actions or the defenses of the separate parties. It does not change the rights of the parties in the separate suits." *Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977). Choice of law is a substantive issue touching the rights of the parties. Just as transfers pursuant to Sections 1404 and 1407 do not affect the applicable choice of law rules, so too the next step in the streamlining process – namely consolidation into one proceeding of two or more actions initially filed in different states – does not affect them.

[63]

*In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).

[64]

*See Favaroth v. Appleyard*, 2000-0359, p.4 (La. App. 4 Cir. 5/2/01), 785 So.2d 262, 265.

the other so to act."[65] Also fundamental is the principle that "[a] principal has the right *to control the conduct of the agent* with respect to matters entrusted to him."[66] Without control, there is no agency relationship.

Here the undisputed facts make it abundantly clear that the HBPs had no ability to control Medco's conduct with respect to the purchase of Rezulin or otherwise. Medco was an independent entity that operated its own vast and complex business. It decided whether to include Rezulin in its formularies and it concluded its own arrangements with suppliers and retail pharmacies.

The plaintiffs nonetheless contend that Medco was their agent on the theory that ES

---

[65]

RESTATEMENT (SECOND) OF AGENCY § 1(1) (emphasis added).

[66]

*Id.* § 14 (emphasis added).

There is no conflict of laws as to these rules. The states the laws of which potentially are applicable are, on the one hand, New Jersey and Nevada, the states in which Medco and its affiliated mail service pharmacy company were located, and, on the other, New York and Louisiana, the states in which ES and LBC were located and the laws of which governed the respective contracts. *See* ES Contract ¶ 14.9; ILGWU Contract ¶ 13.4; LBC Contract ¶ 13.9. These jurisdictions all recognize that control is a *sine qua non* of an agency relationship. *See, e.g., Kernan v. One Washington Park Urban Renewal Assocs.*, 154 N.J. 437, 453, 713 A.2d 411, 419 (1998); *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337, 634 A.2d 74, 79 (1993); *Grand Hotel Gift Shop v. Granite State Ins. Co.*, 108 Nev. 811, 815, 839 P.2d 599, 602 (1992); *Dark Bay Int'l, Ltd. v. Acquavella Galleries, Inc.*, 12 A.D.3d 211, 211, 784 N.Y.S.2d 514, 515 (1st Dep't 2004); *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993). Louisiana uses different terminology, but the result, at least in this case, is the same: "An agency relationship may be created by express appointment of a mandatary" under the Louisiana Civil Code – which did not occur here – "or by implied appointment arising from apparent authority. . . . Implied or apparent agency exists if the principal has the right *to control the conduct of the agent* and the agent has the authority to bind the principal." *McManus v. Southern United Fire Ins.*, 2000-1456, p.2 (La. App. 3 Cir. 3/21/01), 801 So.2d 392, 394 (emphasis added); *accord Barrilleaux v. Franklin Found. Hosp.*, 96-0343 (La. App. 1 Cir. 11/8/96), 683 So. 2d 348, 353-54 (same); *Urbeso v. Bryan*, 583 So. 2d 114, 117 (La. Ct. App. 4th Cir. 1991) (same).

and LBC retained ultimate authority over Rezulin's inclusion in the formularies applicable to their contracts with Medco. But that was true only in a theoretical and ultimately immaterial respect. The HBPs could have insisted, prior to the execution of their contracts with Medco, that Medco either include Rezulin in or exclude it from the formularies covered by their plans. But there is no suggestion that they did so, and once their contracts with Medco were signed, they lost any ability to require inclusion or exclusion of the drug. Thus, the fact that the HBPs might have insisted on contracts giving them control over the drugs included in Medco's formularies is quite immaterial to the agency question for the simple reason that they never did so. Indeed, the fact that Medco was not an agent of either of the HBPs is confirmed by their contracts, which specifically disclaimed agency relationship between them.[67]

Finally, the Court's conclusion would be no different if it were to ignore the contractual provisions limiting the HBPs' freedom. Contrary to the plaintiffs' implication, making

---

[67] The plaintiffs' citation of cases to the effect that the parties' own disclaimers of agency are not conclusive is beside the point for two reasons. First, here it is the entire structure of the parties' relationships, and not just contractual disclaimers and characterizations, that defeats as a matter of law the plaintiffs' assertions of agency. Second, the cited cases all treated situations in which a stranger to the relationship sought to overcome the parties' own characterization. *See* Pl. Mem. 15-16 & n.63 (citing *Bd. of Trade of City of Chicago v. Hammond Elevator Co.*, 198 U.S. 424, 437 (1905) ("The fact, however, that the relations between the defendant and its correspondents are, as between themselves, expressly disclaimed to be those of principal and agent, is not decisive of their relations so far as third parties dealing with them upon the basis of their being agents are concerned."); *Conn. Mut. Life. Ins. Co. v. Spratley*, 172 U.S. 602 (1899) (rejecting Connecticut corporation's argument that its employee served with process in Tennessee could not function as its agent for service of process); *Anchor Savings Bank v. Zenith Mortgage Co.*, 634 F.2d 704, 706 n.2 (2d Cir. 1980) (not applicable because there was no dispute that defendant was plaintiff's agent for servicing mortgages); *In re Shulman Transport Enter., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("[W]here the public interests or the rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it."). In this case, however, HBPs seek to disclaim their own characterizations.

decisions about the inclusion of medications in a formulary is not even close to the same thing as controlling Medco's conduct with respect to the purchase of medication.

## V. Warranty Claims

The plaintiffs assert claims for breach of express and implied warranty, and of the warranty of fitness for a particular purpose under the laws of the District of Columbia and 25 states, 24 of which have adopted Article 2 of the Uniform Commercial Code ("UCC"). As the relevant code provisions are identical or nearly so in those 24 states and the District, the Court considers them together. The Court considers Louisiana, which has not adopted the UCC, separately.

### A. UCC Jurisdictions

The remedy for a breach of warranty, whether express,[68] implied,[69] or of fitness for a particular purpose,[70] belongs solely to a buyer of the goods.[71] WL argues that the HBPs were not

---

[68]  *See* U.C.C. § 2-313.

[69]  *See* U.C.C. § 2-314.

[70]  *See* U.C.C. § 2-315.

[71]  U.C.C. § 2-714 provides as relevant here:

> "(1) Where the buyer has accepted goods and given notification . . . he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

> "(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

buyers for purposes of the relevant statutes and therefore cannot recover on breach of warranty theories. The plaintiffs insist that the HBPs were buyers. They argue that Medco, acting as the HBPs' agent, paid for the drugs on the HBPs' behalf.

As discussed, Medco was not the HBPs' agent. As the HBPs paid most of the cost of the drug, however, the question remains whether that is sufficient to make it a buyer. The UCC defines "buyer" as "a person who buys or contracts to buy goods,"[72] but it does not define "buy." Black's Law Dictionary does not do so either, but it defines "purchaser" as "[o]ne who *obtains* property for money or other valuable consideration; a buyer."[73] This definition comports with common sense, which suggests that one is not a buyer of a good unless one somehow acquires or gains ownership of it.[74]

Also instructive is the UCC's definition of "sale," which is "the passing of title from the seller to the buyer for a price."[75] This provision is not directly on point because it defines only "sale" while assuming some understanding of "seller" and "buyer." Nonetheless, it further supports the proposition that one is not a buyer of a good unless one acquires some kind of ownership rights

---

[72]     *Id*. § 2-103(1)(a).

[73]     BLACK'S LAW DICTIONARY 1248 (7th ed. 1999) (emphasis added).

[74]     A number of federal and state courts have reached this same conclusion. *See, e.g., Voelker v. Porsche Cars N. Am., Inc.,* 353 F.3d 516, 523 (7th Cir. 2003) (a car lessee is not a "buyer" under the UCC because title did not pass to him under the lease agreement); *DiCintio v. DaimlerChrysler,* 97 N.Y.2d 463, 470-71, 742 N.Y.S.2d 182, 185 (N.Y. 2002) (same).

[75]     U.C.C. § 2-106(1).

in it.[76]

Here, of course, ES and LBC gained no rights in the drugs. They did not take title to or possess them. They never had any right to obtain or use the drugs in any way.[77] Indeed, the HBPs had no relationship to the drugs at all other than indirectly funding their purchase. If a pharmacy's or warehouse's supply of medications were destroyed, the HBPs would have sustained no loss. All of the incidents of ownership, including the right to use and dispose and the risk of loss, lay with Medco or the retail pharmacies before dispensation and with the patients themselves afterward.

Paying for part of the cost of something  is not the same as buying it. To be sure, a few cases have treated the lessor in a commercial leasing arrangement – a party that buys a good from a supplier and then leases it to the party that actually uses it, and who may have the option to "buy" it for nominal consideration at the end of the lease term – as a buyer for UCC purposes.[78] In those cases, the lessor's role in substance is that of financier. The lessor advances to the lessee the funds needed to acquire the good from the supplier. And yet, even in such a situation, the lessor has certain rights in the goods – at least some kind of security or reversionary interest – that are relinquished only when the lessee has paid the lessor the full purchase price of the good, plus

---

[76]

The plaintiffs make much of the fact that the UCC itself states that UCC provisions apply irrespective of title unless a provision specifically indicates otherwise. *See* U.C.C. § 2-401. The plaintiffs may be right, but it does not affect the main point here, which is that being a buyer depends on acquiring some kind of ownership rights, even if those do not amount to title in a technical sense.

[77]

*See* Tr. (May 12, 2005) ("Tr.") at 26-27.

[78]

*See Midwest Precision Servs., Inc. v. PTM Indus. Corp.*, 887 F.2d 1128, 1131-34 (1st Cir. 1989); *Evco Distributing, Inc. v. Commercial Credit Equip. Corp.*, 6 Kan. App. 205, 627 P.2d 374 (Ct. App. 1981).

interest. Here, of course, the HBPs did not even have such rights. The plaintiffs have cited no cases, and the Court is aware of none, allowing a party with no residual rights in, or risk in relation to, a good to assert claims under the UCC as a buyer of it.

Nor is this outcome a result of empty formalism. Warranty remedies are based on the theory that anyone who acquires a good in exchange for consideration has a right to recover where the good acquired is worth less than it would have been worth absent a breach of warranty.

That theory is inapplicable here. The HBPs cannot argue that they did not get what they bargained for because the respects in which Rezulin is said to have fallen short of the warranties – safety and efficacy – pertain, for purposes of this lawsuit, only to the patients who consumed the drug. To be sure, Rezulin's alleged deficiencies might cause the HBPs to pay for treatment in connection with catastrophic liver failure or future medical monitoring of past Rezulin users. Any such expenses, however, would have been derivative of injuries suffered by patients. In any case, the HBPs are not asserting derivative injuries in this lawsuit.[79] Rather, the HBPs assert only that they paid more for diabetes therapy than they would have absent WL's alleged misconduct, both because they paid for more Rezulin prescriptions in aggregate and because each individual prescription cost more than it otherwise would have cost. That is injury to be sure, but it is not the sort of injury that

---

[79] The HBPs had to pay as well for substitutes for Rezulin that was dispensed prior to its withdrawal in March 2000 and that subsequently went unused. These so-called "medicine cabinet" costs are a direct, non-derivative injury because the HBPs presumably had to pay for two therapies per patient for the relevant time periods. The claims in relation to "medicine cabinet" injury, however, are separate from the warranty claims and are taken up below.

warranty claims are designed to remedy.[80]

Finally, there may be good policy reasons to give HBPs remedies where pharmaceutical manufacturers make misrepresentations about their products. The UCC, however, is a statute, and the Court presumes that it means what it says. So far, none of the legislatures in any of the 25 UCC jurisdictions identified in the complaint has modified the code to permit recovery on a warranty theory by an HBP against a pharmaceutical manufacturer where the HBP was not a buyer of the drugs. For this Court to achieve the same result under the guise of interpretation would be an arrogation of a power conferred in our system solely upon the legislative branch.

---

[80] Indeed, when the Second Circuit pointed out that an HBP could suffer injury even if its beneficiaries did not, it spoke of fraud, not warranty:

> "Consider . . . a hypothetical in which a defendant drug company markets a 'new,' much more expensive drug claiming it is a great advancement (safer, more effective, etc. than metformin–the standard diabetes drug) when in fact the company is simply replicating the metformin formula and putting a new label on it. In other words, the only difference between metformin and the 'new' drug is the new name and the higher prescription price (paid almost entirely by the insurance company). In that case, the 'new' drug would be *exactly* as safe and effective as metformin, and thus there could be no injury to any of the insurance company's insured. Nevertheless, the insurance companies would be able to claim–precisely as they do here–that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result." 326 F.3d at 349-350.

More importantly, though, the Circuit's discussion assumed – because the complaint alleged – the very proposition in question here – that the HBPs were purchasers or buyers. *See id*. at 349. Indeed, this necessary assumption, and not the federal antitrust cases that the court cited in *dicta*, was dispositive. *See id*. at 350-51.

*B.* *Louisiana*

The result is the same in Louisiana. The Louisiana's Civil Code creates a cause of action for redhibition, which is analogous to breach of warranty.[81] The plain terms of the redhibition statute give the cause of action to a buyer. Louisiana courts have noted that a plaintiff asserting a redhibition claim must prove, among other things, that "the seller sold the thing to him."[82] Louisiana defines a "sale" as "a contract whereby a person transfers ownership of a thing to another for a price in money."[83] Ownership in turn is defined as "the right that confers on a person direct, immediate,

---

[81]

The relevant provision is as follows:

"The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

"A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

"A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price." La. Civ. Code Ann. art. 2520.

*See also McNeeley v. Ford Motor Co.*, 98-2139 (La. App. 1 Cir. 12/28/99), 763 So.2d 659, 669 ("Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold that renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice. A buyer may bring an action against all sellers in the chain of sales back to the primary manufacturer to rescind the sale for breach of an implied warranty." (citation omitted)).

[82]

*Id*.

[83]

La. Civ. Code Ann. art. 2439.

and exclusive authority over a thing."[84] Here, as discussed above, the HBPs did not gain ownership of the drug within the meaning of the Louisiana Civil Code. The plaintiffs cite no authority for the proposition that in Louisiana, one who supplies part of the payment for a good thereby becomes a buyer of it. For these reasons and the others discussed above in connection with the UCC, the Court concludes that LBC was not a buyer of Rezulin within the meaning of Article 2520 of the Louisiana Civil Code.

## VI. Claims under Consumer Protection Statutes

### A. ES's Claims

#### 1. Choice of Law

ES has asserted claims under the consumer protection and deceptive trade practices statutes of 26 states. These regimes are quite varied. It therefore is necessary to make a choice of law determination before analyzing the merits of ES's claims.

The potentially relevant states are (1) New York, the state in which ES is based and in which it suffered injury, and (2) New Jersey, the state in which WL and Medco are based and in which WL made the alleged misrepresentations to Medco.[85]

---

[84] *Id*. art. 477.

[85] The claims asserted under the consumer protection and deceptive trade practices statutes of the other 25 states are immaterial. Rezulin was dispensed to ES's members in a number of states, but ES is not suing derivatively for injury to its members. The only injury asserted here – namely the loss ES allegedly suffered when it overpaid for diabetes drugs – occurred in New York. Likewise, the conduct at issue – for the most part, communications made by WL and received by Medco – occurred between two New Jersey-based corporations. There is nothing in the record to suggest that activities in connection with the misrepresentations occurred anywhere other than New Jersey and, perhaps, New York.

In tort cases, New York aims to give "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."[86] Under this "interest analysis," "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[87] In this case, that is New York because that is where ES allegedly suffered injury.[88] While New Jersey has an interest in regulating a corporation with its principal of business there, New York's interest in protecting its citizens against injury from deceptive practices is at least as great as New Jersey's interest in preventing its citizens from committing such practices. The Court therefore applies New York law and proceeds to examine ES's claim under Section 349 of the New York General Business Law. The claims under the consumer protection and deceptive trade practices statutes of all other states, insofar as they are asserted by ES, are dismissed.

---

[86]

*Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922 (1993) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749 (1963)); *see also Miller v. Miller*, 22 N.Y.2d 12, 15-16, 290 N.Y.S.2d 734, 736-37 (1968).

[87]

*Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922; *accord Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521-22, 620 N.Y.S.2d 310, 311 (1994) ("a distinction must be made between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses. In the former case the law of the place of the tort governs." (citation omitted)).

[88]

*See Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195, 491 N.Y.S.2d 90, 93-94 (1985) ("when the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred. Thus, the locus in this case is determined by where the plaintiffs' injuries occurred." (citation omitted)); *accord Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 192-93, 683 N.Y.S.2d 179, 189 (1st Dep't 1998) ("The place of occurrence of the tort will be where the plaintiff suffered the injury sued upon.").

### 2.    Merits

Section 349 of New York's General Business Law provides as relevant here:

"(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

\*    \*    \*

"(h) . . . any person who has been injured by reason of any violation of this section may bring an action . . . to recover his actual damages . . . ."

A plaintiff asserting a Section 349 claim "must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."[89]

WL makes four arguments regarding ES's Section 349 claim: (1) ES, as a third-party payer, lacks standing, (2) the causation requirement is not met here, (3) ES does not challenge "consumer-oriented" conduct, and (4) WL benefits from a safe harbor in the statute for conduct in compliance with federal regulations.[90] The Court finds it necessary to consider only the third of these arguments.

The New York Court of Appeals has explained:

"As shown by its language and background, section 349 is directed at wrongs against the consuming public. General Business Law article 22-A, of which section 349 is a part, is entitled 'Consumer Protection from Deceptive Acts and Practices.' The structure of the law, with the Attorney-General initially wielding sole enforcement power in the name of the State, speaks to its public focus. Finally, the Governor's Memorandum approving the bill (L.1970, ch. 43) lauds its consumer-protective purpose . . . . Thus, as a threshold matter, plaintiffs claiming the benefit of section 349– whether individuals or entities such as the plaintiffs now before us–must charge

---

[89]    *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000).

[90]    *See* N.Y. GEN. BUS. LAW § 349(d) (McKinney 2005).

conduct of the defendant that is consumer-oriented."[91]

Furthermore, in the same decision, the Court of Appeals, in order to avoid "a tidal wave of litigation against businesses that was not intended by the Legislature," adopted "an objective definition of deceptive acts and practices" as "those likely to mislead a reasonable consumer acting reasonably under the circumstances."[92]

This authoritative construction of Section 349 controls the disposition of ES's claim. The conduct for which ES seeks to hold WL liable was directed at Medco, not at diabetes patients. It consisted of WL's efforts to persuade Medco, a large and sophisticated business, to include Rezulin in its formularies. The nature of this marketing effort – communication from one sophisticated business to another – was quite different from that of any promotion aimed directly at diabetes patients.[93]

A closely analogous case is *St. Patrick's Home for the Aged and Infirm v. Laticrete International, Inc.*[94] There the plaintiff nursing home sued the defendant manufacturer for damage

---

[91]

> *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 24-25, 623 N.Y.S.2d at 532; *accord Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 343, 704 N.Y.S.2d 177, 182 (1999) ("General Business Law § 349 was enacted initially to give the Attorney General enforcement power to curtail deceptive acts and practices–willful or otherwise–directed at the consuming public.").

[92]

> *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26, 623 N.Y.S.2d at 533; *accord Gaidon*, 94 N.Y.2d at 344, 704 N.Y.S.2d at 183.

[93]

> As anyone who watches television nowadays knows, some prescription drugs are promoted directly to potential users. The record is silent as to whether that occurred with respect to Rezulin. But that is immaterial. The injury complained of in this case is that caused by WL's alleged deception of Medco, another large and sophisticated business entity.

[94]

> 264 A.D.2d 652, 696 N.Y.S.2d 117 (1st Dep't 1999).

sustained when the construction and installation of the home's exterior wall, which had been manufactured by Laticrete, proved to be defective. The nursing home sought to recover on the theory that Laticrete had made misrepresentations about its products to the firm that St. Patrick's had hired to install the panels. The Appellate Division dismissed the Section 349 claim because:

> "Laticrete's sale of the [panels] to [the installer] did not constitute consumer-oriented conduct. The transaction in this case was a sizable one between two companies in the building construction and supply industry. It did not involve any direct solicitation by Laticrete, which had no contact with the plaintiff, the ultimate consumer. Significantly, sophisticated business entities such as [the construction manager], [the project architect] and [the installer] acted in an intermediary role in the transaction, thereby reducing any potential that a customer in an inferior bargaining position would be deceived."[95]

The same is true of this case. The inclusion of Rezulin in Medco's formularies had sizeable economic consequences and occurred as a result of communications made and received by two large companies in the pharmaceutical industry. The representations that WL made to Medco were not intended for diabetes patients, the ultimate consumers. A sophisticated business entity – Medco – acted in an intermediary role, thus reducing the potential that parties in an inferior bargaining position – diabetes patients or even, arguably, ES – would be deceived.

To be sure, some of the cases, albeit perhaps speaking more broadly than their facts warranted, have defined "consumer oriented" as referring to conduct having "a broad impact on consumers at large."[96] And it is undeniable that WL's motive for persuading Medco to include

---

[95]

264 A.D.2d at 655, 696 N.Y.S.2d at 122 (citations omitted).

[96]

See, e.g., U.W. Marx, Inc. v. Bonded Concrete, Inc., 7 A.D.3d 856, 858, 776 N.Y.S.2d 617, 619 (3d Dep't 2004); Scott v. Bell Atlantic Corp., 282 A.D.2d 180, 183, 726 N.Y.S.2d 60, 63 (1st Dep't 1999); see also In re Pharm. Ind. Average Wholesale Price Litig., 339 F. Supp. 2d 165, 181-83 (D. Mass. 2004).

Rezulin in its formulary was to increase consumption of the drug. Even such a broad definition of "consumer oriented," however, would not save ES's claim. The alleged misconduct at issue here did not have any broad impact relevant to this case on diabetes patients at large.[97] It had a broad impact, if any, on the HBPs. It was they who allegedly overpaid for diabetes treatment. Indeed, the plaintiffs' position is that whenever WL promoted Rezulin to Medco, the true targets were the HBPs. But HBPs are not consumers.[98] Accordingly, even under a broad definition, WL's representations to Medco were not "consumer oriented" for purposes of Section 349. ES's Section 349 claim is dismissed.

2. *LBC's Claims*

LBC has asserted also claims under the consumer protection and deceptive trade practices statutes of 26 states. Under Louisiana's choice of law statute,

> "an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

---

[97]

The parties have not pointed to any evidence that diabetes patients paid higher copayments for Rezulin than they would have paid for an alternative. Even if there were such evidence, it is not clear that it would be material, given the prohibition discussed above on claims for derivative injury.

[98]

"'Consumers' are 'those who purchase goods and services for personal, family or household use.'" *Med. Soc'y of State of New York v. Oxford Health Plans, Inc.*, 15 A.D.3d 206, 790 N.Y.S.2d 79, 79 (1st Dep't 2005) (quoting *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 73, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (citing *Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 289, 703 N.Y.S.2d 103, 106 (1st Dep't (2000))); *see also Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 583 (S.D.N.Y. 1999) (rejecting § 349 claim because "[a]lthough plaintiffs claim that they were acting as consumers and thus should be protected by the statute, in fact this case involves businesses engaged in arm's length transactions for services that are not available to the general public. Nor, of course, does the fact that consumers were the ultimate end-users convert the transaction into a consumer transaction.").

"That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state."[99]

The potentially relevant states are (1) Louisiana, the state in which LBC is based and in which it suffered injury, and (2) New Jersey, the state in which WL and Medco are based and in which WL made the alleged misrepresentations to Medco.

There is no need to determine whether Louisiana or New Jersey law would apply to LBC's claims because there is no actual conflict between the laws of the two states.[100]

The Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA") provides that:

"[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages."[101]

Although the Louisiana Supreme Court has not addressed the issue, the majority of Louisiana courts, "both state and federal, have uniformly held the personal right of action granted

---

[99] LA. CIV. CODE ANN. art. 3515; *accord Champagne v. Ward*, 2003-3211, p.22 (La. 1/19/05), 893 So. 2d 773, 786.

[100] *Favaroth v. Appleyard*, 2000-0359, p.4-5 (La. App. 4 Cir. 5/2/01), 785 So.2d 262, 265 (no need to continue with a choice of law analysis where there was no actual conflict with respect to the dispositive issue).

[101] LA. REV. STAT. ANN. § 51:1409 (2005).

under LUTPA applies only to direct consumers or to business competitors."[102]   Accordingly, although a handful of decisions by Louisiana's First Circuit Court of Appeals have given the statute a more expansive reading,[103] the "prevailing jurisprudence" holds that only direct consumers and business competitors may sue under LUTPA.[104]

There is no evidence to suggest that LBC was a business competitor of WL. The only question, then, is whether LBC qualifies as a consumer of WL's products. The LUTPA defines a consumer as "any person who uses, purchases, or leases goods or services."[105] Further, the Fifth Circuit has held that this definition must be read in conjunction with the term "consumer transaction," which LUTPA defines as "any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household

---

[102]

*Vermillion Hosp., Inc. v. Patout,* 2005-82, p.4 (La. App. 3 Cir. 6/8/05), 906 So. 2d 688, 692 (collecting cases); *see also, e.g., Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc.,* 292 F.3d 471, 480 (5th Cir. 2002) (only consumers and business competitors may recover under LUTPA); *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 225-26 (5th Cir. 1991) (same); *Hamilton v. Bus. Partners, Inc.,* 938 F. Supp. 370, 372-74 (E.D. La. 1996) (collecting cases and holding that only consumers and business competitors may recover under LUTPA); *Levine v. First Nat'l Bank of Commerce,* 2002-1114 (La. App. 5 Cir. 4/29/03), 845 So.2d 1189, 1193 (same); *Nat'l Gypsum Co. v. Ace Wholesale, Inc.,* 1998-1196 (La. App. 5 Cir. 6/1/99), 738 So.2d 128, 130 (same).

[103]

*See, e.g., Plaquemine Marine, Inc. v. Mercury Marine,* 2003-1036, p.6-7 (La. App. 1 Cir. 7/25/03), 859 So.2d 110, 117 (private right of action under LUTPA not restricted to consumers and business competitors); *Capitol House Pres. Co. v. Perryman Consultants, Inc.,* 1998-1514, p.12 (La. App. 1 Cir. 12/10/98), 725 So.2d 523, 530 (same); *Jarrell v. Carter,* 1989-1274 (La. App. 1 Cir. 6/28/91), 577 So.2d 120, 123 ("Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members.").

[104]

*Vermillion Hosp.,* 2005-82 at p.5, 906 So. 2d at 692.

[105]

La. Rev. Stat. Ann. § 51:1402(1) (2005)

use."[106] Here, LBC certainly did not engage in any transaction intended for its own personal, family, or household use. Nor did it use, purchase, or lease Rezulin from WL. Accordingly, LBC was not a "consumer" even without reference to the definition of "consumer transaction."[107] LBC therefore could not recover under LUTPA.

Any claim under New Jersey's Consumer Fraud Act (the "CFA") also would be defective. The CFA authorizes a private action to gain a "refund" of moneys acquired by means of:

> "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]"[108]

The New Jersey courts have construed the statute to permit only a "consumer" to sue.[109] Although

---

[106]

LA. REV. STAT. ANN. § 51:1402(1) (2005); *Orthopedic & Sports Injury Clinic,* 922 F.2d at 226.

[107]

*Hamilton,* 938 F. Supp. at 374-75 (distributor of licensed products was not a "consumer" under LUTPA because it did not acquire products to personal, family, or household use); *Levine,* 845 So.2d at 1193 (indirect purchaser of real property was not a "consumer" under LUTPA).

[108]

N.J. STAT. ANN. §§ 56:8-2, 56:8-2.11, 56:8-2.12 (West 2005).

[109]

*See Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 12, 860 A.2d 435, 441 (2004) ("In furtherance of the Act's overarching remedial purpose, a *consumer* may file a private cause of action against an offending merchant whenever that *consumer* suffers an ascertainable loss as a result of a violation of the Act." (emphasis added)); *Weinberg v. Sprint Corp.*, 173 N.J. 233, 248, 801 A.2d 281, 290 (2002) ("More than a decade after the Act was passed, it was amended to permit *individual consumers* to bring private actions to recover refunds." (emphasis added)); *Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.*, 376 N.J. Super. 48, 57, 868 A.2d 1162, 1168 (App. Div. 2005); *City Check Cashing, Inc. v. Nat'l State Bank*, 244 N.J. Super. 304, 309, 582 A.2d 809, 811 (N.J. Super. Ct. App. Div. 1990).

the courts are not in uniform agreement, a frequently used definition of "consumer" in New Jersey is "one who uses (economic) goods, and so diminishes or destroys their utilities."[110] Under this definition, LBC was not a consumer of prescription drugs. Cases declining to adopt categorically this definition of "consumer" also do not avail the plaintiffs because even those appear to take for granted that the plaintiff must be the one who in some sense benefits from the use of the good or service in question.[111] LBC was no such thing. Accordingly, LBC could not recover under the CFA.

LBC's claims under state consumer protection and deceptive trade practices statutes therefore are dismissed.

### VII. Unjust Enrichment and Restitution

The unjust enrichment claim is based on the theory that WL's misrepresentations

---

The Court recognizes that one court has allowed a union health plan to sue a pharmaceutical manufacturer under the Consumer Fraud Act on the same grounds advanced here. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, No. ATL-L-3015-04, slip op. at 7-11 (N.J. Super. Ct. Law. Div. July 8, 2004). The decision, however, is of a trial court. To the extent that it is inconsistent with the state appellate authorities allowing only a consumer to sue, the Court declines to follow it.

[110]

*City Check Cashing*, 244 N.J. Super. at 309, 582 A.2d at 811; *accord Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 469 (D.N.J. 1998); *Conte Bros. Auto, Inc. v. Quaker State-Slick 50, Inc.*, 992 F. Supp. 709, 716 (D.N.J. 1998); *Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F. Supp. 562, 567 n.6 (D.N.J. 1997); *cf. Kavky v. Herbalife Int'l of America*, 359 N.J. Super. 497, 502-06, 820 A.2d 677, 680-83 (App. Div. 2003) (rejecting the *City Check* definition of 'consumer' and noting that "the Act is concerned, not so much with the specific nature of the property, but rather with whether the property is generally made available to the public"); *Neveroski v. Blair*, 141 N.J. Super. 365, 378, 358 A.2d 473, 480 (App. Div. 1976) (observing that the statute reflects "an intent to protect the consumer in the context of the ordinary meaning of that term in the market place"); *J&R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (same).

[111]

*See Kavky*, 359 N.J. Super. at 502-06, 820 A.2d at 680-83; *Neveroski*, 141 N.J. Super. at 378, 358 A.2d at 480; *J&R Ice Cream Corp.*, 31 F.3d at 1273-74 & n.14.

caused the plaintiffs to overpay for diabetes drugs and that WL's retention of the benefit from sales of Rezulin would be unjust.

At the outset, it may be worthwhile to clarify the relationship between restitution and unjust enrichment. "Restitution" sometimes is used to refer to a remedy in which the defendant relinquishes a benefit conferred upon it. As a general matter, however, the term perhaps is best used as referring to the set of substantive legal doctrines designed to avoid unjust enrichment.[112] The consequence of liability in restitution is the defendant's relinquishment of the benefit in question.[113]

It is worth noting as well that the complaint in this case includes a separate claim for "equitable restitution" of amounts received[114] for unused Rezulin – the so-called "medicine

---

[112]

> *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1, cmts. a, b, h. (Discussion Draft 2000) ("RESTATEMENT").

[113]

> *See, e.g.*, *id.* § 1 cmt. a.
>
> Many jurisdictions use these terms interchangeably or only use one of them. New York courts, for example, recognize a cause of action for unjust enrichment: "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another which, in good conscience, ought to be returned." *Carriafielo-Diehl & Assocs., Inc. v. D & M Elec. Contracting, Inc.*, 12 A.D.3d 478, 479, 784 N.Y.S.2d 617, 618 (2d Dep't 2004); *accord Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481, 787 N.Y.S.2d 48, 49 (2d Dep't 2004) (citing *Paramount Film Distrib. Corp. v. State of N.Y.*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972) (citing, among other authorities, the RESTATEMENT (FIRST) OF RESTITUTION for the proposition that "[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered[.]"). "Unjust enrichment" often is equated with quasi-contract or a contract implied in law, but the latter actually are remedies imposed to avoid unjust enrichment in specific circumstances. A claim sounding in restitution or unjust enrichment need not be based on or otherwise implicate the quasi contract remedy.

[114]

> The complaint actually claims restitution for amounts *paid* by the plaintiff HBPs. Am. Cpt ¶ 164. This is a contradiction in terms. Where there is liability in restitution, the measure of damages is benefits received, not costs incurred. *See, e.g.*, RESTATEMENT § 1 cmt. a.

cabinet damages" – but neither side mentions this claim in its briefs. At oral argument, plaintiffs'

counsel treated "medicine cabinet damages" as a category of damage cognizable on other claims

rather than as an independent cause of action.[115]

That is a sensible approach. Where there is no unjust enrichment, there can be no

liability in restitution.[116] If WL's retention of the benefit of sales of unused Rezulin would not

constitute unjust enrichment, then WL is not liable in restitution for the restoration of those

benefits. Accordingly, the Court will treat the plaintiffs' claim for equitable restitution based on

their payments for unused Rezulin as a subset of their claim of unjust enrichment or restitution

based on all of their payments for Rezulin.

*A.*     *ES' Claim for Unjust Enrichment*

*1.*     *Choice of Law*

A choice of law is necessary because different states have different doctrines

respecting unjust enrichment and restitution.

---

[115]

      Tr. 32 ("The easiest damage category that we have to understand, to conceptualize, is what we call the medicine cabinet damages.").

[116]

      *See, e.g.*, RESTATEMENT § 1 cmt. a-b ("The source of a liability in restitution is the receipt of an economic benefit under circumstances such that its retention without payment would result in the unjust enrichment of the defendant at the expense of the plaintiff. . . . The law of restitution is the law of unjust enrichment . . . .The substantive part of the law of restitution is concerned with identifying those forms of enrichment that the law treats as 'unjust' for purposes of imposing liability."); 66 AM. JUR. 2d *Restitution and Implied Contracts* § 10 ("Unjust enrichment is usually a prerequisite for the enforcement of the doctrine of restitution; if there is no basis for unjust enrichment, there is no basis for restitution." (footnotes omitted)).

According to the RESTATEMENT (SECOND) OF CONFLICT OF LAWS,[117] the law governing a claim for restitution to recover for unjust enrichment is that of the state which, with respect to each issue, "has the most significant relationship to the occurrence and the parties." Factors to be taken into account in this grouping of contacts approach, as relevant here, include "the place where the benefit or enrichment was received," "the place where the act conferring the benefit or enrichment was done," and the domicile and place of business of the parties.[118] The RESTATEMENT notes as well that where, as here, the claim for restitution does not stem from any relationship between the parties, the place where the benefit or enrichment was received "will usually be [the contact] of greatest importance with respect to most issues." Particular weight will be given to the state in which the act conferring the benefit or enrichment was done if the place where the benefit or enrichment was received cannot be identified or differs from the place where the act conferring the benefit was done and bears little relation to the occurrence and the parties. Finally, the importance of the geographic location of the parties "depends largely upon

---

[117]

The New York courts have not spoken to the precise question of the choice of law rules applicable to a claim of restitution or unjust enrichment, which, at least in the form presented here, does not clearly resemble a contract or a tort. The New York Court of Appeals, however, has adopted the approach of the RESTATEMENT and relied heavily on it as persuasive authority in most of its major conflict of laws decisions. *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609 (1994); *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 595 N.Y.S.2d 919, 922 (1993); *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90 (1985); *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64 (1972); *Miller v. Miller*, 22 N.Y.2d 12, 290 N.Y.S.2d 734 (1968); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963). This Court sees no reason why the Court of Appeals would not follow the RESTATEMENT approach were it presented with this case.

[118]

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221.

the extent to which they are grouped with other contacts."[119]

In this case, the benefit or enrichment was received in New Jersey because that is where WL was based. The allegedly deceptive promotional material was created by New Jersey-based WL and received by New Jersey-based Medco. The record reflects at least one exchange of correspondence concerning Rezulin's clinical features between representatives of the two companies, both of them located in New Jersey.[120] Accordingly, the alleged inequitable conduct occurred in or at least had the most significant relationship to New Jersey.

The acts conferring the benefit occurred in a variety of locations. Those benefits resulted from, at the very least, (1) payments from the wholesalers (the locations of which are not revealed by the record) to New Jersey-based WL, (2) payments from New Jersey-based Medco to the wholesalers, and (3) payments from New York-based ES to New Jersey-based Medco. The RESTATEMENT does not give particular weight to the state in which the act conferring the benefit was done – in this case, New York and potentially a number of other states not revealed definitively by the record – where, as here, the place where the enrichment was received can be identified and bears a strong relationship to the occurrence and the parties. For all of these reasons, New Jersey law should govern ES's claim for unjust enrichment.[121]

2.      Merits

---

[119]    *Id*. cmt. d.

[120]    *See* St. Phillip Decl. Ex. 8 at MEDCO 2235-68.

[121]    *Cf. Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 121 (2d Cir. 1984).

The New Jersey Supreme Court has explained that to establish unjust enrichment, "a plaintiff must show both that defendant received a benefit and that the retention of that benefit without payment would be unjust."[122] The benefit at issue must have been conferred on the defendant by the plaintiff, not by some third party.[123] Further, the plaintiff must show "that it expected remuneration from the defendant at the time it performed or conferred a benefit on the defendant."[124]

In order to state a claim for unjust enrichment, then, ES had to show that it –

---

[122]

*VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554, 641 A.2d 519, 526 (1994); *see also Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 575, 677 A.2d 747, 752-53 (1996) (observing that "the key element" of a restitution claim "is that one party has been unjustly enriched at the expense of another.").

[123]

*Eli Lilly & Co. v. Roussel Corp.,* 23 F. Supp.2d 460, 496 (D.N.J. 1998) ("[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim.") (applying New Jersey law); *In re Lead Paint Litig.,* No. A-1946-02T3, 2005 WL 1994172, at *14 (N.J. Super. A.D. Aug. 17, 2005) (same). The Court recognizes that *In re Lead Paint* is an unpublished opinion and thus not a binding precedent. N.J. COURT RULES 1:36-3 (2005). Nevertheless, this Court considers it as persuasive authority in seeking to understand the parameters of unjust enrichment claims under New Jersey law. *See CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 962 F.2d 77, 96-97 (1st Cir. 1992) (considering an unpublished New Jersey Superior Court case despite its lack of "formal precedential weight"). Furthermore, as the Third Circuit explained in citing another unpublished opinion, "[t]he New Jersey rules are, of course, binding only on the New Jersey courts." *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 152 (3d Cir. 1988).

[124]

*VRG Corp.,* 135 N.J. at 554, 641 A.2d at 526; *see also Castro v. NYT Television*, 370 N.J. Super. 282, 300, 851 A.2d 88, 99 (App. Div. 2004) (hospital patients who were filmed in the emergency room for a reality television show could not recover on a theory of unjust enrichment against the media companies who filmed them because the patients could not have reasonably expected that they would receive remuneration for their participation in the show); *Fasching v. Kallinger,* 211 N.J. Super. 26, 35-36, 510 A.2d 694, 699-700 (App. Div. 1986) (surviving next of kin of murder victim could not recover on a theory of unjust enrichment against the author and publisher of a book about the murder because plaintiffs had no direct relationship with the author and publisher and expected no remuneration from them).

rather than a third party – conferred a benefit on WL and that it expected remuneration from WL. ES has not met this burden. ES contracted with Medco, not WL, to provide prescription drug benefits to its members. It paid Medco, not WL, and expected Medco, not WL, to provide services in exchange for that payment. There is no evidence that ES had any direct contact with WL at all, much less that it conferred a benefit directly on WL or expected remuneration directly from WL. Accordingly, ES cannot recover against WL under a theory of unjust enrichment.

The fact that ES may have conferred a benefit on WL indirectly does not alter this conclusion. It is true that ES paid Medco in exchange for the provision of prescription drug benefits to its members, that Medco in turn paid various drug wholesalers to purchase Rezulin to dispense to ES's members, and that these wholesalers in turn paid WL by purchasing Rezulin for resale to Medco and other PBMs.

This chain is too attenuated to give rise to a claim for unjust enrichment by ES. Under New Jersey law, absent a mistake by the person conferring the benefit, unjust enrichment claims require "some direct relationship between the parties."[125] Based on this principle, New Jersey courts have rejected unjust enrichment claims arising out of relationships more direct than the one at issue here. For example, in *Insulation Contracting & Supply v. Kravco, Inc.*,[126] the court held that a subcontractor could not recover against a property owner on a theory of unjust

---

[125]

   *Callano v. Oakwood Park Homes Corp.,* 91 N.J. Super. 105, 109, 219 A.2d 332, 335 (App. Div. 1965); *see also Fasching,* 211 N.J. Super. at 35-36, 510 A.2d at 699-700 (unjust enrichment claim dismissed because plaintiffs and defendants had no direct relationship).

[126]

   209 N.J. Super. 367, 379, 507 A.2d 754, 761 (App. Div. 1986); *see also, e.g., F. Bender, Inc. v. Jos. L. Muscarelle, Inc.,* 304 N.J. Super. 282, 284-85, 700 A.2d 374, 376 (App. Div. 1997) (sub-subcontractor could not recover against owner or general contractor on a theory of unjust enrichment).

enrichment because the subcontractor contracted with and expected remuneration from the general contractor only, not from the property owner.[127]  The court in *Callano v. Oakwood Park Homes Corp.,*[128] reached a similar conclusion.  The plaintiffs there, two nursery owners, had planted shrubbery on defendant's property based on a contract with the intended buyer of that property, who died before taking possession of the property and before paying plaintiffs for their services.  Although the addition of the shrubbery had increased the value of defendant's property, the court held that plaintiffs could not recover on a theory of unjust enrichment because they had "no dealings with defendant, and did not expect remuneration from it when they provided the shrubbery."[129]

Accordingly, ES's claim for unjust enrichment is dismissed.

B.     *LBC's Claims*

Louisiana's choice of law statute requires application of "the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." That state is determined with reference to "the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and

---

[127] New York courts have taken the same position.  *Metro. Elec. Mfg. Co. v. Herbert Constr. Co., Inc.,* 183 A.D.2d 758, 758, 583 N.Y.S.2d 497, 498 (2d Dept. 1992) (sub-subcontractor was not in privity with general contractor or property owner and therefore could not recover against them on a theory of unjust enrichment); *Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ. 5191, 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) (under New York law, "an unjust enrichment claim . . . requires some type of direct dealing or actual, substantive relationship with a defendant").

[128] 91 N.J. Super. 105, 109, 219 A.2d 332, 335 (App. Div. 1965).

[129] *Id.*

(2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state."[130]

In this case, New Jersey has a far stronger relationship than Louisiana to the occurrences that form the basis of the unjust enrichment claim. Its policies therefore are most pertinent. The parties' justified expectations and the interest in not subjecting a party to the law of more than one state do not point in a different direction. Accordingly, the Court applies New Jersey law. The defendant therefore is entitled to summary judgment dismissing LBC's claim of unjust enrichment.

*   *   *

If, as plaintiffs contend, WL misled Medco and other PBMs with the consequence that the PBMs either overpaid for Rezulin or bought it rather than cheaper drugs that they otherwise would have bought, WL may have obtained an economic benefit that, in justice and good conscience, it did not deserve.  This Court, however, is duty-bound to apply the law of the states in question.  Its proper functions do not include creation of remedies that neither the legislatures nor the courts of those states have seen fit to create.

---

[130] La. Civ. Code Ann. art. 3515.

*VIII.    Conclusion*

The defendant's motion for summary judgment dismissing the action [00 Civ. 2843, docket item 2751] is granted.

SO ORDERED.

Dated: September 29, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)